```
               IN THE DISTRICT COURT OF THE UNITED STATES
                  FOR THE MIDDLE DISTRICT OF ALABAMA
                            NORTHERN DIVISION
```

| | |
|---|---|
| ROBERT PEARSON, )<br>　　　　　　　　　　　　　　　　　　)<br>　　Plaintiff, )<br>　　　　　　　　　　　　　　　　　　)<br>　　v. )<br>　　　　　　　　　　　　　　　　　　)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>　　　　　　　　　　　　　　　　　　)<br>　　Defendant. ) | CIVIL ACTION NO. 2:08cv213-CSC<br>(WO) |

**MEMORANDUM OPINION and ORDER**

**I. Introduction**

The plaintiff, Robert Pearson ("Pearson"), applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income benefits pursuant to Title XVI, 42 U.S.C. § 1381 *et seq.*, alleging that he was unable to work because of a disability. His application was denied at the initial administrative level. Pearson then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review.

On September 15, 2003, Pearson filed a complaint in this court. On April 21, 2004, the court determined that the ALJ failed to fully develop the evidence concerning Pearson's mental impairments, including his depression and personality disorder, and reversed and remanded the case to the Commissioner of Social Security ("Commissioner") for further proceedings.

On February 24, 2005, the ALJ conducted a second hearing. The ALJ subsequently denied the claim and the Appeals Council rejected Pearson's request for review. The Appeals Council's decision consequently became the final decision of the Commissioner.[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C. § 405 (g) and § 1631(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner must again be reversed and this case remanded to the Commissioner for further proceedings.

## II. Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

To make this determination,[2] the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. § 404.1520, §416.920.

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the

---

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. Administrative Proceedings

Pearson was 43 years old at the time of the February 24, 2005, hearing before the ALJ. (R. 506.) He graduated from high school and completed two years of junior college. (R. 507.) Pearson's prior work experience includes working as a construction worker, grocery stocker, battery stacker, plastic recycler, box assembler, and fast food cook. (R. 409, 508-512.) Pearson alleges that he became disabled due to back pain, nerves, vision problems, two pinched nerves in his lower back, and mental problems. (R. 97, 517-18.) Following the hearing, the ALJ concluded that Pearson had severe impairments of personality disorder, depressive disorder, borderline intellectual functioning, alcohol abuse, history of right hip fractures, history of asthma, mild scoliosis, mild osteoarthritis, spina bifida occulta, status post stab wound to abdomen, pain disorder, and a history of polysubstance abuse. (R. 404.) The ALJ found that Pearson "retains the residual functional capacity to perform the exertional demands of sedentary work." (R. 409.) The ALJ also determined that Pearson is unable to perform his past relevant work. (R. 409.) Relying on the testimony of the vocational expert, the ALJ concluded that there were a significant number of jobs in the national economy that the plaintiff could perform, including work as a ticket salesperson, garment sorter, and factory hand worker. (R. 410) Accordingly, the ALJ concluded that Pearson was not disabled. (*Id*.)

4

## IV. Discussion

Pearson alleges that he is disabled in part due to a mental impairment. He has been essentially homeless for most of his adult life and does not have a treating physician. The medical records, however, include consultative examinations conducted by two psychologists and one psychiatrist. Pearson asserts that the ALJ improperly discounted the psychiatric opinion of Dr. Clemmie Palmer. In his analysis, the ALJ assigned minimal weight to the opinions of Dr. Cline, a consultative psychologist, and Dr. Palmer, a consultative psychiatrist, and great weight to the initial opinion of Dr. Jacobs, a consultative psychologist. (R. 406.) In addition, the ALJ relied on the testimony of a non-examining psychologist, Dr. Doug McKeown. (*Id.*) After careful review of the administrative record, this court concludes that this case is due to be remanded to the Commissioner for the ALJ to resolve conflicts and inconsistencies between Dr. J. Walter Jacobs' first evaluation conducted on May 1, 2001, and his subsequent evaluation conducted on October 26, 2004. In addition, the court concludes that the case is due to be remanded for the ALJ to correctly treat Dr. Sandra Cline, Dr. Clemmie Palmer, and Dr. Jacobs as examining consultative physicians, to discuss Dr. Cline's and Dr. Palmer's assessments of post-traumatic stress disorder features and any effect this condition may have on Pearson's ability to work, and to consider what effect, if any, Pearson's financial condition has on his ability to afford medical treatment.

On July 7, 2000, Pearson had a psychological consultative examination at the request of the Disability Determination Service. (R. 137.) Dr. Cline conducted the evaluation. She noted that the plaintiff reported problems with his nerves, including a nervous breakdown

at eleven years old after his mother died. (*Id.*) Dr. Cline reported that the plaintiff's affect was blunted, and he was angry, sullen, and resentful. (R. 139.) Pearson reported that "he was depressed, feels empty, irritable, cannot sleep ("maybe 3 hours"), and has no energy." (R. 140.) "He feels worthless, has difficulty thinking, concentrating, and making decisions." (*Id.*) Dr. Cline's diagnostic impressions were as follows:

> AXIS I:   Rule out psychotic disorder NOS versus Major depression with Psychotic features; possible PTSD
> AXIS II:  Personality disorder NOS
> AXIS III: Pinched nerve, headaches, by history

(R. 140.)

> Dr. Cline also noted that
>
> Robert is a 38 year old single black male with a long history of problems since his mother's death when he was 11, abandonment by his father a few years later, and multiple moves, some of which were no doubt due to his behavior. . . . In the process of being homeless and dependent on friends, he has developed a serious personality disorder that further prevents him from receiving the support he longs for. He is resentful, blaming everyone but himself for his current situation.
>
> He does appear to have symptoms of both major depression and paranoia. In addition, he continues to see and feel the presence of his friend who died in the accident that injured his nerves. . . . He does appear to be in need of comprehensive medical treatment, which possibly could be provided by Vocational Rehabilitation. However, once he was treated, he would need extensive therapy to deal with the trauma of the accident and the loss of his mother at a young age.
>
> While he reports doing well in school, he probably should not manage funds at this time, as he does not appear to have the judgment necessary to do so in his best interests. He also does not appear to be able to function independently at this time. This examiner also allows for the possibility that he has some type of dissociative disorder, given his trance-like states at times followed by a startle reflex. He was unable to remember three words after a brief delay and thus would have difficulty remembering work instructions.

6

(R. 140-41.)

On May 1, 2001, the plaintiff had a second psychological consultative examination at the request of the Disability Determination Service. (R. 178.) Dr. Jacobs conducted the evaluation. (*Id.*) The psychologist noted that he did not review any records in conjunction with his evaluation. (*Id.*) After a mental examination, Dr. Jacobs found that Pearson was alert, oriented to place, person and time, and his affect was labile. (R. 179.) Dr. Jacobs also noted Pearson's "rather surly attitude." (*Id.*) Pearson reported that his appetite and energy were diminished; he experienced "fragmented sleep," crying episodes, and suicidal thoughts; and he had "feelings of sadness, helplessness and hopelessness. (*Id.*) Dr. Jacobs administered the WAIS-III to the plaintiff who obtained a verbal I.Q. score of 88, a performance I.Q. score of 77 and a full scale I.Q. score of 81. (R. 180). Dr. Jacobs noted that "[t]hese scores are certainly lower that one would expect in a person who has completed two years of college. Intellectually, he is quite capable of employment." (*Id.*)

Dr. Jacobs also administered the MMPI-II to the plaintiff. Dr. Jacobs determined that an elevated score on the F-scale reflected

> random responses, frank psychotic processes or a deliberate attempt to exaggerate pathology known as a "plea for help" profile. This last option seems most likely. . . . Since [Pearson] has endorsed a myriad of somatic and psychological symptoms, the profile is of little usefulness toward the end of differential diagnosis.

(*Id.*). Dr. Jacobs' diagnostic impressions were as follows:

AXIS I:   Depressive Disorder, NOS
          Alcohol Abuse

7

>    AXIS II:     Personality disorder NOS
>                 Borderline Intellectual Functioning
>    AXIS III:    Deferred to Medical Records

(R. 180-81). Dr. Jacobs also noted that

> [i]n the mental status exam, Mr. Pearson endorsed symptoms of depression. On the MMPI-II, he endorsed everything so that eight of the ten clinical scores were extremely elevated. The assessment of memory and cognition suggested a person of low average to borderline ability. Formal assessment yielded a Full Scale IQ in the upper reaches of the borderline range. Certainly from an intellectual perspective, Mr. Pearson is employable. The examiner would conclude that there is some degree of depression, but this is difficult to gauge. Alcohol abuse appears to be ongoing. From an intellectual perspective, Mr. Pearson would appear capable of functioning independently. He is also able to manage funds although one wonders whether he would do so prudently.

(R. 181).

On October 26, 2004, Dr. Jacobs conducted an additional consultative evaluation of Pearson. (R. 448.) The psychologist noted that Pearson was hostile, angry, rambling, paranoid, and poorly motivated. (R. 449, 451.) When Dr. Jacobs asked whether "[Pearson] ever thought about killing someone else, he responded, 'All the time, especially that one that stuck me with a knife.'" (*Id.*) During the consultative examination, Pearson was administered the MMPI-II. Once again, Pearson's score on the F-Scale was extremely elevated. (R. 451.) Dr. Jacobs determined

> Such a score would raise the possibility of frank psychosis, random responding or a deliberate attempt to present himself in a pathological manner. The examiner believes that the last explanation seems most likely. Mr. Pearson has endorsed a plethora of psychological and physical symptoms. The extreme elevation of the F scale renders the MMPI-II invalid. However, there is little doubt that Mr. Pearson is experiencing very significant emotional distress.

(*Id.*) Dr. Jacobs' diagnostic impressions were as follows:

8

> AXIS I:	Major Depression, Recurrent, Moderate
> Pain Disorder Associated with Both Psychological
> Features and a General Medical Condition
>
> AXIS II:	Personality Disorder NOS
> Borderline Intellectual Functioning

(*Id.*)  In addition, Dr. Jacobs gave the following prognosis:

> Mr. Pearson would have a poor prognosis without psychiatric treatment.  In spite of his obvious emotional problems, the claimant does not appear to have made any attempt to seek mental health services.

(*Id.*)  Dr. Jacobs also noted that "from an intellectual perspective, Mr. Pearson is capable of functioning independently and managing financial resources for his own best interests."  (R. 452.)

On February 18, 2005, Pearson had a consultative psychiatric consultation at the request of his lawyer.  Dr. Palmer conducted the examination.  Dr. Palmer noted that Pearson had served in the Navy for one year and seven months and, according to the records, "had temper problems in the Navy and could not stand to be around a lot of people."  (R. 496.)  During the evaluation, Pearson reported that he prefers to be alone, that he feels threatened and paranoid all the time, and that his goal in life is not to be around anybody.  (R. 497.)  Dr. Palmer noted that Pearson's thought process showed a decreased ability to focus, shift, and sustain attention and that his thought content included hallucinations, such as seeing his friend who died during a car accident.  (*Id.*)  Dr. Palmer's diagnostic impressions were as follows:

> AXIS I:	Depressive disorder, NOS, with PTSD features
> History of alcohol, marijuana, and cocaine abuse in the past

      AXIS II:      Borderline Intellectual Functioning.

(*Id.*)  Dr. Palmer concluded:

> This patient's main diagnosis is depression.  He does have PTSD features and borderline intellectual function. He was motivated to complete the examination. His ability to work with others is severely limited. He is not able to remember and follow simple instructions in order to complete an 8-hour workday.

(*Id.*)

In his residual functional capacity assessment, Dr. Palmer determined that Pearson's estimated deficiencies of concentration, persistence, or pace, and his impairments of ability to respond appropriately to customary work pressures, supervision, and co-workers were extreme. (R. 498-99.)  In addition, the psychiatrist noted that Pearson was severely ill and would decompensate with minimal work activity and that he "needs psychiatric treatment."  (R. 499.)

In his analysis, the ALJ accepted the testimony of a medical expert, Dr. Doug McKeown. Specifically, the ALJ relied on Dr. McKeown's testimony that Dr. Jacobs' opinion that Pearson indicated "depressive symptomology but no treatment" with moderate limitations was reasonable and that Dr. Palmer's findings of marked to severe limitations were overstated. (R. 404-05.)  When assigning great weight to Dr. Jacobs' initial assessment of Pearson's functional abilities, the ALJ failed to reconcile inconsistencies between Dr. Jacobs' initial findings in his May 2001 evaluation, in which he found that "there is some degree of depression, but this is difficult to gauge," with his findings in his October 2004 evaluation, in which he determined that "Pearson is experiencing very significant emotional distress." (R.

181, 451.) It is the responsibility of the Commissioner, and not the court, to reconcile inconsistencies in the medical evidence. Because the ALJ did not properly reconcile these inconsistencies in the evidence, the court cannot conclude that the Commissioner's decision is supported by substantial evidence.

The court notes that the ALJ gave great weight to Dr. Jacobs' initial assessment of Pearson's functional abilities, relying on his opinion that "from an intellectual perspective the claimant was employable." (R. 405.) The mere fact that Pearson may intellectually be capable of working does not address the impact of any psychological impairment on his ability to work. Additionally, the ALJ chose to rely on Dr. Jacobs' May 2001 opinion that Pearson had the intellectual capacity to work and ignored conflicts in the evidence indicating that the claimant suffers from other psychological impairments. The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion.

This court also concludes that the ALJ's rationale for giving greater weight to the opinion of Dr. Jacobs over the opinions of the other examining mental health specialists based on their status as non-treating physicians is misplaced. In his analysis, the ALJ discounted the opinions of Dr. Cline and Dr. Palmer on the basis that these examining mental health specialists were not treating physicians. (R. 406.) The ALJ, however, determined that the opinion of Dr. Jacobs should be assigned greater weight because he is an examining psychologist and a mental health specialist. (*Id*.) The record indicates that both Dr. Jacobs and Dr. Cline are psychologists, that Dr. Palmer is a psychiatrist, and that all three of these mental

health specialists are examining physicians. Dr. Cline and Dr. Palmer each examined Pearson on one occasion and Dr. Jacobs examined him twice, once in 2001 and once in 2004. (R. 137, 178, 448, 496.) Thus, it is clear that none of the mental health specialists in the medical record were treating physicians. Nonetheless, in cases involving mental illness, the opinions of mental health specialists are especially important. *Mulholland v. Astrue*, No. 1:06cv2913-AJB, 2008 WL 687326, *12 (N.D. Ga. Mar. 11, 2008). Consequently, the ALJ erred in failing to treat all of the consultative mental health specialists equally in this regard.

The ALJ also discounted Dr. Palmer's opinion on the basis that "[Pearson] underwent the examination by Dr. Palmer not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal," emphasizing that "the doctor was presumably paid for the report." (R. 408-09.) The rejection of an examining physician's findings on the basis that the examination was conducted at the request of the claimant's attorney is not a reason to contradict a mental health specialist's diagnosis. *Mulholland v. Astrue*, No. 1:06cv2913-AJB, 2008 WL 687326, *12 (N.D. Ga. Mar. 11, 2008).[4]

In addition, the ALJ incorrectly determined that "Dr. Palmer indicated Depressive Disorder, NOS, mild to moderate, not major magnitude and no treatment." (R. 406.) As previously discussed, the medical records indicate that Dr. Palmer diagnosed Pearson as

---

[4]Presumably, the Commissioner paid Dr. Cline and Dr. Jacobs as well. If the court accepted the ALJ's rationale for discounting Dr. Palmer's opinion, it would also be necessary to discount all medical opinions which in turn would lead to the conclusion that no substantial evidence supports the Commissioner's opinion. The mere fact that an expert is hired is not a sufficient basis to discredit his professional opinion.

12

suffering from depressive disorder, NOS, with PTSD features and that his ability to work with others is severely limited. (R. 497.) In addition, Dr. Palmer found that Pearson would have marked to extreme limitations on his ability to perform in a work setting, that he is severely ill and needs psychiatric treatment, and that he would decompensate with minimal work activity. (R. 498-99.) Thus, the ALJ's determination that Dr. Palmer found mild to moderate limitations without major magnitude is a mischaracterization of the evidence.

The ALJ also gave substantial weight to the opinion of Dr. McKeown, a non-examining physician. The record indicates that, during the hearing, Dr. McKeown testified by cellular phone while driving down a highway. (R. 504, 530.) Although Dr. McKeown testified that he had reviewed the medical evidence in this case, the court is unable to determine whether he read Dr. Palmer's evaluation in its entirety prior to the hearing. (R. 524.) During his testimony, Dr. McKeown stated that "the record has identified through at least three consultative evaluations [a]n individual with a depressive disorder NOS." (R. 525.) In the medical records, the first three consultative evaluations conducted by Dr. Cline and Dr. Jacobs indicate that Pearson suffered from a depressive disorder. Dr. Palmer's report, the fourth consultative evaluation, was entered into evidence on the day of the hearing. (R. 526.) Because the report was entered into evidence the same day as the hearing in which Dr. McKeown was not physically present and the psychologist initially referred to no more than three consultative evaluations when testifying, it is arguable that he did not review Dr. Palmer's fourth evaluation. However, the record also indicates that Dr. McKeown did have some knowledge of the content of Dr. Palmer's report. After the ALJ generally summarized

13

all four of the mental health evaluations, Dr. McKeown referred to Dr. Palmer's assessment of a depressive disorder, NOS; neither the ALJ nor Dr. McKeown, however, mentioned Dr. Palmer's diagnosis of "Depressive Disorder, NOS, **with PTSD features**" during the proceeding. (R. 497.) (Emphasis added.) Thus, the court cannot discern from the transcript whether Dr. McKeown reviewed Dr. Palmer's fourth consultative evaluation in its entirety prior to the hearing. Consequently, this court cannot conclude that the ALJ's reliance on Dr. McKeown's opinion that Dr. Palmer's findings of marked to severe ratings are overstated is supported by substantial evidence.

By rejecting Dr. Palmer's opinion regarding Pearson's marked to severe inability to function in a work setting and accepting Dr. McKeown's opinion that "the magnitude of [Pearson's] depression under a depressive disorder, NOS, would not constitute symptomology that would prohibit work activity,"[5] the ALJ failed to address Dr. Palmer's finding of post-traumatic stress disorder features. Several factors indicate that Pearson has post-traumatic stress disorder features and experiences significant emotional distress. For example, Dr. Cline determined that Pearson's affect was blunted, angry, sullen, and resentful, and that her diagnostic impression included "rule out psychotic disorder NOS versus major depression with psychotic features; possible PTSD." (R. 140.) During Dr. Jacobs' second consultative evaluation in November 2004, Pearson was hostile, angry, rambling, defensive, and paranoid, and indicated that he thought about killing someone else "[a]ll the time." (R. 449, 451.) Dr. Jacobs also noted that "there is little doubt that Mr. Pearson is experiencing very significant

---

[5] (R. 528.)

14

emotional distress" and concluded that he would have a poor prognosis without psychiatric treatment.  (R. 451.)  In addition, Dr. Palmer noted that records indicate that Pearson was discharged from the Navy because he had "temper problems" and "could not stand to be around a lot of people." (R. 496.)  During Dr. Palmer's evaluation, Pearson also indicated that he prefers to be alone and does not trust himself or others, he feels threatened and paranoid all the time, and that "his goal in life is not to be around anybody."  (R. 497.)  Dr. Palmer diagnosed Pearson as suffering from "depressive disorder NOS, with PTSD features."  (*Id.*) Despite evidence indicating that Pearson has features of post-traumatic stress disorder and suffers from very significant emotional distress, the ALJ failed to question the medical expert about these findings, discuss these findings in the medical records, or specifically find Pearson's PTSD features to be a severe impairment.  As previously discussed, the ALJ is not free to simply ignore medical evidence or select only those portions which support his ultimate conclusion.  Because the ALJ did not consider evidence indicating that Pearson suffers from PTSD features when discussing his residual functional capacity to perform sedentary work, the court cannot conclude that the ALJ's decision is supported by substantial evidence.

The inconsistency in the evidence concerning Pearson's residual functional capacity is precisely the issue which the ALJ has failed to clarify and develop fully.  Thus, doubt is necessarily cast on the ALJ's determination of Pearson's residual functional capacity.  Without developing the record more fully by resolving the conflicts in the evidence, the ALJ could not make an informed decision on Pearson's residual functional capacity based on the record before him and thus, his decision is not supported by substantial evidence.  Therefore, in light

of the inadequate development of the record, the court cannot determine whether the ALJ's residual functional capacity determination that Pearson is able to perform sedentary work is correct.

More importantly, this court concludes that the ALJ failed to consider Pearson's inability to afford medical treatment when determining that he has the residual functional capacity to perform sedentary work. The ALJ discredited Pearson's allegations of mental problems based on the lack of medical treatment. While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment. *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988). During the hearing, Pearson testified that he has not sought medical treatment because he has no money. (R. 513.) In addition, the medical records are replete with references to Pearson's inability to afford medical treatment. (R. 137, 447-48, 496.) For example, in July 2000, Dr. Cline noted that Pearson does not have a doctor and takes no medication because he has no money or health insurance. (R. 137.) In October 2004, Dr. Jacobs indicated that Pearson has no health insurance and is not able to afford health care. (R. 448.) In February 2005, Dr. Palmer noted that Pearson takes ibuprofen because he cannot afford prescription medication. (R. 496.)
When discrediting Pearson's testimony and concluding the lack of mental health records establish that Pearson has the residual functional capacity to return to perform sedentary work, the ALJ failed to consider whether Pearson's financial condition prevented him from seeking medical treatment. Thus, the court concludes that the ALJ erred as a matter of law in

discrediting Pearson's testimony based on his failure to seek medical treatment.

## V. Conclusion

Consequently, this case is due to be remanded to the Commissioner for the following:

(1) The ALJ should resolve inconsistencies between Dr. Jacobs' May 2001 evaluation and his October 2004 evaluation when discussing the effect of Pearson's mental condition on his ability to work.

(2) The ALJ should recognize that Dr. Cline, Dr. Jacobs, and Dr. Palmer are consultative examining physicians.

(3) The ALJ should correct his characterization of Dr. Palmer's opinion to reflect a diagnosis of depressive disorder, NOS, with PTSD features and a finding that Pearson's ability to work with others is severely limited.

(4) The ALJ should discuss Dr. Cline's and Dr. Palmer's assessments of post-traumatic stress disorder features and any effect this condition may have on Pearson's ability to perform work.

(5) The ALJ should consider what effect, if any, Pearson's financial condition has on his ability to afford medical treatment.

A separate final judgment will be entered.

Done this 4th day of September, 2009.

                    /s/Charles S. Coody
               CHARLES S. COODY
               UNITED STATES MAGISTRATE JUDGE